## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BOARD OF TRUSTEES, ROOFERS LOCAL NO. 30 COMBINED WELFARE FUND, et al.,** | : : : : | |
| **Plaintiffs,** | : : | **CIVIL ACTION** |
| **v.** | : : | **NO. 10-4721** |
| **INTERNATIONAL FIDELITY INSURANCE COMPANY,** | : : : | |
| **Defendant.** | : | |

### MEMORANDUM OPINION

TUCKER, C.J.                                                    October 21, 2014

Presently before the Court are cross-motions for summary judgment in a diversity action

for a breach of contract. Upon careful consideration of the parties' submissions and exhibits

thereto and for the reasons set forth below, the Court will grant in part and deny in part

Plaintiffs' motion and deny Defendant's motion in its entirety.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Because the Court writes primarily for the parties, it sets forth only those facts that are

relevant to its conclusion. Though the parties contest the significance of the facts underlying this

action, they largely do not dispute the facts themselves. Plaintiffs are trust funds established in

Pennsylvania under collective bargaining agreements ("CBAs") between Local Union No. 30 of

the United Union of Roofers, Waterproofers and Allied Workers ("Union") and two companies,

Brown's Roofing, Inc. ("Brown") and Brown & Guarino, Inc. ("B&G", or collectively

"Companies"). Defendant International Fidelity Insurance Company ("IFIC") is a surety

company based in Newark, New Jersey with whom Companies entered into surety bond agreements to guarantee contributions to Plaintiffs.

At all times relevant to this action, Brown and B&G were bound by CBAs with Union, which required the payment of fringe benefit contributions to Plaintiffs and the maintenance of surety bonds on those contributions.  On or about June 19, 2006, IFIC issued one surety bond each to B&G ("B&G Bond") and Brown ("Brown Bond").  Both bonds were in the amount of $400,000.  On May 13, 2008, IFIC issued bond riders, effective June 19, 2008, that increased the B&G Bond to $800,000 ("B&G Bond Rider") and decreased the Brown Bond to $250,000 ("Brown Bond Rider").  The bond agreements contained identical terms and provisions.  They provided that, within one year of default by the applicable Company, Plaintiffs are to notify IFIC of a claim against the bond.  IFIC would then pay all sums due in accordance with the terms of the bond agreements.

As of December 2007, B&G was the biggest offender against the Union for failure to pay required contributions to Plaintiffs.  On May 27, 2008, Plaintiffs made a "final" demand for payment to B&G in the amount of $365,545.02 for contributions, interest, and liquidated damages.  This demand was made two weeks after IFIC had issued the B&G Bond Rider that increased the B&G Bond's penal amount from $400,000 to $800,000.

At that time, Brown had also become delinquent on its contributions.  On May 27, 2008, Plaintiffs made a similar "final" demand to Brown for payment of $394,407.67.

When neither Brown nor B&G satisfied their delinquencies, Plaintiffs initiated separate suits against them on August 5, 2008 for failure to make required contributions pursuant to the CBAs and the Employee Retirement Income Security Act ("ERISA").  Those actions were resolved when Plaintiffs entered into settlement agreements on January 7, 2009 with both

2

Companies.  The agreements required Brown and B&G to pay "settlement sums" in monthly installments in addition to regular contributions already required under their respective CBAs. The "settlement sums" were equal to the then-existing delinquency amounts owed by the Companies.  On February 16, 2009 and June 8, 2009, Plaintiffs secured consent judgments against B&G and Brown, respectively, for payments pursuant to the settlement agreements.  *See Bd. of Trustees, Roofers Local No. 30 Combined Welfare Fund, et al. v. Brown & Guarino, Inc.*, Civ. A. No. 08-3689, Doc. 12; *Bd. of Trustees, Roofers Local No. 30 Combined Welfare Fund, et al. v. Brown's Roofing, Inc.*, Civ. A. No. 08-3690, Doc. 6.  IFIC never received notice from Plaintiffs of these prior actions, the settlement agreements, or the consent judgments.

By January 2010, both Brown and B&G had stopped making contributions under both the settlement agreements and the CBAs.  On June 11, 2010, Plaintiffs sent IFIC a claim on the B&G Bond in the amount of $771,833.75, which was the total sum due for B&G's delinquencies between April to October 2008 and January to April 2010.  On June 18, 2010, IFIC responded by letter, requesting further documentation and denying Plaintiffs' claim with respect to the April to October 2008 delinquency because over a year had elapsed.  IFIC further wrote that Plaintiffs never advised it of B&G's delinquency from April to October 2008.  IFIC characterized this as a material omission because it would not have issued the B&G Bond Rider in June 2008 had it known of B&G's delinquency.

On June 18, 2010, Plaintiffs sent to IFIC a claim on the Brown Bond in the amount of $166,211.01.  Ten days later, IFIC responded by requesting further documentation.

When IFIC failed to pay on either claim, Plaintiffs initiated two suits against IFIC on September 15, 2010—one to enforce the Brown Bond and the other to enforce the B&G Bond. This Court consolidated the cases by an order dated November 23, 2010.  After the close of

discovery, each party filed a motion for summary judgment, responses, and replies thereto.
Plaintiffs seek judgment on the merits, an award of $1,029,729.98 in damages, and an additional
award of attorneys' fees and costs.  IFIC denies liability.  The Court heard oral arguments from
the parties on September 15, 2014 and this matter is now ripe for review.

## II.      STANDARD OF REVIEW

The court will grant a motion for summary judgment "if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law."  FED. R. CIV. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012).
"A motion for summary judgment will not be defeated by 'the mere existence' of some disputed
facts, but will be denied when there is a genuine issue of material fact."  *Am. Eagle Outfitters v.
Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 247-48 (1986)).  A genuine issue of material fact exists if, after making all
reasonable inferences in the nonmoving party's favor, a reasonable jury could find for the
nonmoving party.  *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010).
An issue of fact is "material" if it "might affect the outcome of the case under governing law."
*Byrne v. Chester Cnty. Hosp.*, Civ. A. No. 09-889, 2012 WL 4108886, at *2 (E.D.Pa. Sept. 19,
2012) (citing *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)).  The court is "not to
weigh the evidence or determine the truth of the matter, but only to determine whether the
evidence of record is such that a reasonable jury could return a verdict for the nonmoving party."
*Am. Eagle Outfitters*, 583 F.3d at 581.

The movant bears the initial burden of informing the court of the basis for summary
judgment and identifying the portions of the record that demonstrate the absence of a genuine
issue of material fact.  *Byrne*, 2012 WL 4108886, at *2.  Once this burden is met, the non-

moving party must then "set forth specific facts showing that there is a genuinely disputed factual issue for trial." *Id.* It may cite to particular parts of the materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute. FED. R. CIV. P. 56(c)(1). However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

## III.   DISCUSSION

The parties' cross-motions for summary judgment and the responses and replies thereto present the following dispositive issues: whether and to what extent the bond agreements provide for Plaintiffs' discretion in determining "default" by the Companies; whether a material modification of the bonded obligation took place such that IFIC's liability is discharged; whether Plaintiffs are entitled to damages; whether the B&G Bond Rider is valid; and whether Plaintiffs are entitled to additional attorneys' fees and costs by exercise of this Court's equitable powers. The Court will address each issue in turn.

### A.  Plaintiffs' Determination of Default was a Valid Exercise of Discretion Under the Bond Agreements

As a federal court sitting in diversity, this Court applies Pennsylvania law to the interpretation of surety contracts. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").[1] Under Pennsylvania law, a surety agreement is a contract and its language determines the surety's rights and liabilities. *Beckwith Machinery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 890 A.2d 403, 406 (Pa. Super. Ct. 2005); *see Berks Prod. Corp. v. Arch Ins. Co.*, 72 A.3d 315, 319 (Pa. Commw. Ct. 2013) ("[W]hen interpreting a

[1] Both parties have assumed that Pennsylvania law applies to the bond agreements, which were executed in Pennsylvania. Thus, this Court will not engage in a conflict of laws analysis.

5

bond, the language of the bond is determinative."), *appeal denied*, 89 A.3d 662 (Pa. 2014).  The

primary determinants of a surety's liability are the intent and meaning of the bond instrument.

*Berks Prod. Corp.*, 72 A.3d at 319.  A written contract that is clear and unambiguous may be

interpreted by the court as a matter of law.  *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905

A.2d 462, 469 (Pa. 2006).  The court constructs "the intent from all words and clauses used and

taken as a whole, with due regard to the surrounding circumstances." *Sippel Dev. Co., Inc. v.*

*Western Sur. Co.*, No. 2:05-cv-46, 2008 WL 728649, at *3 (W.D.Pa. Mar. 17, 2008) (quoting

*Lite-Air Prods., Inc. v. Fid. & Deposit Co. of Md.*, 437 F. Supp. 801, 802 (E.D.Pa. 1977)).  In

determining a surety's liability, the court is bound by the terms of the bond.  *Berks Prod. Corp.*,

72 A.3d at 319.  When multiple reasonable interpretations are possible, the court is to interpret

surety bonds liberally in favor of a third party to the bond.  *Id.*; *see Poole v. Great Am. Ins. Co.*,

182 A.2d 509, 510 (Pa. 1962) (quoting *Pa. Tpk. Comm'n v. Andrews & Andrews*, 47 A.2d 220,

222 (Pa. 1946)) ("It is . . . well settled that 'corporate surety bonds are to be construed strictly in

favor of the obligee and such donee beneficiary as comes within its terms.'").  But "a surety can

be bound only to the extent and in the manner and under the circumstances set forth in [the]

agreement." *Reliance Universal, Inc. of Ohio v. Ernest Renda Contracting Co., Inc.*, 454 A.2d

39, 45 (Pa. Super. Ct. 1982) (quoting *Can-Tex Indus. v. Safeco Ins. Co. of Am.*, 460 F. Supp.

1022, 1025 (W.D.Pa. 1978)).

   At the heart of this case is the interpretation of the Brown and B&G bond agreements.

The parties' cross-motions are based on their competing theories about when default occurred

under the bond agreements for the purposes of triggering IFIC's payment obligations.  The

parties agree that IFIC's payment obligations under the bond would be triggered upon notice

from the Plaintiffs of a valid claim within one year of default.  Plaintiffs argue that declaration of

"default" under the bond agreements is within their sole and absolute discretion. Thus, according to Plaintiffs, default occurred in June 2010 and Plaintiffs' notice of claim is timely. IFIC argues, however, that Plaintiffs' determination of "default" is impliedly limited to reasonable decisions made in good faith. Thus, according to IFIC, default occurred no later than August 2008 and Plaintiffs' notice of claim is untimely.

As a preliminary matter, the Court finds the language of the bond agreements to be unambiguous regarding the extent of IFIC's surety obligations. The terms of the Brown and B&G bond agreements are identical. Paragraph 1 describes the conditions for payment by IFIC:

> In the event the [Company] fails to remit any sums owed to or on account of the [Plaintiffs] during the period covered by the collective bargaining agreement(s) between the [Company] and the Union . . ., the Surety hereby warrants, guarantees and agrees to pay to the [Plaintiff] Funds, within fifteen (15) days of notice of a claim hereunder by the [Plaintiff] Funds or their counsel, all sums which become due for current, delinquent, and future wages and/or fringe benefits and Union funds as provided in said collective bargaining agreement(s), and the cost of collection including, but not limited to, interest, liquidated damages, fees and costs, and all expenses related to the collection up to the total sum of $400,000 . . . .

(B&G Bond, Pls.' Mot. for Summ. J., Ex. 9, ¶ 1, Doc. 44-14.)  According to this provision, IFIC becomes liable for payment upon the occurrence of two condition precedents: (1) the Company fails to remit sums owed under its CBA with Union, and (2) Plaintiffs or Plaintiffs' counsel sends notice of a claim to IFIC within one year of default. *See Acme Mkts., Inc. v. Fed. Armored Express, Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994) ("[A] condition precedent may be defined as a condition which must occur before a duty to perform under a contract arises.").  The parties do not dispute the existence of these condition precedents. They also do not dispute the extent of IFIC's liability when the conditions are satisfied. IFIC's obligation under the bonds is to pay "all sums which become due," including "current, delinquent, and future wages and/or fringe benefits and Union funds" as well as "interest, liquidated damages, fees and costs, and all

expenses related to the collection . . . ."  IFIC's liability is limited, however, to $800,000 for the B&G Bond and $250,000 for the Brown Bond in accordance with the terms of the bond agreements and bond riders.[2]

    The central issue that divides the parties is whether Plaintiffs' notices of claims sent in June 2010 satisfied the second condition precedent for the purposes of triggering IFIC's payment obligations.  Again, the Court turns to the language of the bond agreements to determine the intent and meaning of the notice provision.  Paragraph 2 of the agreements states:

> In the event of default on the part of the [Company], the [Plaintiff] Funds shall notify the Surety within one (1) year after actual knowledge of such default.  *A default shall be defined as occurring at such a point in time as it is determined within the sole and exclusive discretion of the [Plaintiff] Funds, that the [Company] has accrued delinquencies in contributions which cannot be resolved with the [Company].*

(B&G Bond, Pls.' Mot. for Summ. J., Ex. 9, ¶ 2, Doc. 44-14) (emphasis added).  According to these terms, notice of a claim is valid if sent within one year of "actual knowledge of such default."  The agreement goes on to define "default," which means that "default" is to be given special meaning different from, for example, a "delinquency," which remains undefined in the agreements.  "Default" occurs at that point in time when Plaintiffs determine, in their "sole and exclusive discretion," that the Company's delinquencies cannot be resolved.  The intent of the parties could not be clearer.  By granting "sole and exclusive discretion" to the Plaintiffs in declaring default, the agreements evidence a clear intent that such a decision lies in the hands of Plaintiffs alone.

    Plaintiffs assert that their determination of default, made in their sole and exclusive discretion, occurred in June 2010.  At that time, Plaintiffs concluded that Brown and B&G had accrued delinquencies of a degree that warranted default under the bonds.  This Court is bound to

---

[2] IFIC takes issue with the extent of its liability under the B&G Bond by arguing that the B&G Bond Rider was invalid.  The Court will address this contention later in its analysis.

give effect to the agreements' grant of discretion to the Plaintiffs. *See Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006) (quoting *Gene & Harvey Builders v. Pa. Mfrs. Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1983)) ("Where . . . the language of the contract is clear and unambiguous, a court is required to give effect to that language.") The Court therefore finds that "default" occurred in June 2010 for the purposes of imposing on IFIC a duty to pay under the bond agreements. Plaintiffs' notices of claims, sent through counsel, are therefore timely and valid. Further, since IFIC did not make payment after notice was sent, the Court finds IFIC to be in breach of the bond agreements.

IFIC argues that even if Plaintiffs had discretion to determine the date of default, their exercise of it is subject to reasonableness and good faith. It asserts that Plaintiffs' commencement of litigation against Companies in August 2008 was the point at which Plaintiffs determined that B&G and Brown were in "default" under the bond agreements. To support this contention, IFIC looks to Plaintiffs' collection policy, which requires Plaintiffs' counsel to provide an opinion on "the availability and efficacy of alternative strategies for collecting the Delinquency" before commencing litigation. (Funds Collection Policy, Def.'s Mot. for Summ. J., Ex. 9, ¶ 9(a), Doc. 45-5.) The collection policy also requires Plaintiffs to direct their counsel to draw upon the bond or other security if an employer does not remit payment within ninety days of the payment's due date. (*Id.* ¶ 7(a).) IFIC argues that these policy mandates, together with evidence that Brown and B&G were delinquent for some time prior to August 2008, demonstrate that Plaintiffs should have declared default no later than August 2008 when they commenced litigation against Brown and B&G. IFIC concludes that Plaintiffs' failure to give notice of a claim within one year of August 2008 releases IFIC from liability for payment.

According to IFIC, Plaintiffs' belated declaration of default in June 2010 was neither reasonable nor made in good faith and should therefore be invalid.

Based on the cases that IFIC cites, it appears that IFIC is asserting a defense that Plaintiffs' decision violated the duties of good faith and fair dealing.  IFIC points to a variety of cases that hold parties to implied duties of good faith and fair dealing arising from contractual relationships.  In *Goldstein v. Johnson & Johnson*, the Third Circuit interpreted the contractual grant of discretion to an employer who was also acting as the plan administrator of an executive benefits plan.  251 F.3d 433, 435 (3d Cir. 2001).  It stated, "Ordinary contract principles require that, where one party is granted discretion under the terms of the contract, that discretion must be exercised in good faith—a requirement that includes the duty to exercise the discretion reasonably."  *Id.* at 444.  *Montanez v. HSBC Mortgage Corporation*, a case regarding a mortgage servicer's alleged abuse of "force-placed" insurance policies, also discussed a contractual grant of discretion: "The covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way."  876 F. Supp. 2d 504, 513 (E.D.Pa. 2012) (quoting *Phila. Plaza-Phase II v. Bank of Am. Nat'l Trust & Savings Assoc.*, No. 3745, 2002 WL 1472337, at *6 (Pa. Ct. Com. Pl. June 21, 2002)).  IFIC also cites *Herzog v. Herzog*, which analyzed the implied covenants of a marital settlement agreement, for the proposition that the duty of good faith and fair dealing "imposed on every contract, . . . certainly requires both parties to act consistent with the justified expectations of the other party."  887 A.2d 313, 317 (Pa. Super. Ct. 2005).

IFIC's argument, however, overlooks a fundamental condition to the imposition of the duties of good faith and fair dealing—that the duties arising from a contract apply only to the contracting parties.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ("Every contract

imposes *upon each party* a duty of good faith and fair dealing in its performance and its enforcement." (emphasis added)).  It is well settled that a contract of suretyship is one between the principal and the surety.  *Reliance Ins. Co. v. Penn Paving, Inc.*, 734 A.2d 833, 836 (Pa. 1999); *see Deeter v. Dull Corp., Inc.*, 617 A.2d 336, 341 (Pa. Super. Ct. 1992) ("We have held that a contract of suretyship is solely between the principal debtor and the surety/obligor."); *Trident Corp. v. Reliance Ins. Co.*, 504 A.2d 285, 290 (Pa. Super. Ct. 1986) ("[T]he suretyship contract is formed at the time the surety's offer is accepted by the principal[.]"); *First Indem. of Am. Ins. Co. v. Tiedeken*, 139 F. App'x 375, 378 (3d Cir. 2005) ("Under Pennsylvania law, a surety contract between the principal and the surety is not dependent upon the acceptance of the surety bonds by the obligee."); *see also Upper Pottsgrove Twp. v. Int'l Fidelity Ins. Co*, 976 F. Supp. 2d 598, 603-04 (E.D.Pa. 2013) (distinguishing insurance contracts from suretyships because the insurer and insured have a direct contractual relationship in the former, but a surety and a protected third party do not have a direct contractual relationship in the latter).  The implied covenants of good faith and fair dealing in a bond agreement therefore apply only to the principal and the surety; here, they apply only to IFIC and Brown as parties to the Brown Bond, and IFIC and B&G as parties to the B&G Bond.  Plaintiffs, as obligees to the bond agreements, are not subject to these implied covenants.

Even if IFIC were able to demonstrate that Plaintiffs must abide by standards of good faith and fair dealing in exercising their discretion, this Court finds that Plaintiffs did so.  More specifically, the Court finds reasonable Plaintiffs' decision not to declare default at the time they commenced litigation against Brown and B&G in 2008.  The parties do not dispute that Brown and B&G were delinquent on contributions at the time Plaintiffs filed suit.  Plaintiffs reasonably believed that bringing suit would be an effective means of collecting on these delinquencies.

They also felt that doing so did not contravene the effect of the bonds since the bonds provided that "[a]ny extension of time granted to a [Company] to make payments . . . or to cure a default shall not require notice to or consent from the surety." (B&G Bond, Pls.' Mot. for Summ. J., Ex. 9, ¶ 9, Doc. 44-14.) Plaintiffs also knew that B&G and Brown had previously resolved delinquencies through settlement agreements and sought to avail themselves of a similar remedy. Finally, and perhaps most compellingly, Plaintiffs believed that declaring default on the bonds would signal B&G and Brown's lack of creditworthiness and usher in their financial and operational demise. Plaintiffs, who had every incentive to keep the Companies afloat for the employment of Union members, therefore reasonably decided not to declare default until after it became clear that even their settlement agreements with Brown and B&G would not be performed.

IFIC additionally argues that Pennsylvania law supports the fact that Brown and B&G were in default as of the date of Plaintiffs' suits against them. IFIC reasons that Plaintiffs' suits against Brown and B&G for contract breaches are ripe only after default occurs. Thus, IFIC concludes, the commencement of the August 2008 actions is a judicial admission that Plaintiffs determined Brown and B&G to be in default. IFIC primarily relies on *Leedom v. Spano*, in which a Pennsylvania appellate court held that the limitations period for making a claim against a surety begins to run within a reasonable time after a material default has occurred. 647 A.2d 221, 226 (Pa. Super. Ct. 1994). The *Leedom* court reversed the trial court's conclusion that the statute of limitations on a guarantee begins only when the obligee declares the principal to be in default and demands payment. *Id.* at 225, 229.

*Leedom*, however, can be distinguished from the instant case in that the surety agreement did not mention how default was to be determined. *Id.* at 224 n. 3. The agreement also did not

explicitly condition the limitations period on the obligee's provision of notice of a claim to the surety. *Id.* The *Leedom* court was therefore free to conclude, upon reliance on Pennsylvania common law, that the statute of limitations began to run within a reasonable time after default. But here, the Brown and B&G Bonds explicitly state that default is to be determined at Plaintiffs' discretion and the one-year period in which Plaintiffs must make a claim for payment begins when such default is declared. These provisions neutralize the application of the *Leedom* holding since IFIC agreed to the enforcement of these express terms at the execution of the bond agreements. *Cf. First Nat'l Consumer Disc. Co. v. McCrossan*, 486 A.2d 396, 399-400 (Pa. Super. Ct. 1984) (giving effect to the terms of guaranty documents in waiving precepts of surety law which would have otherwise imposed on the creditor a duty not to impair collateral). Thus, IFIC's claim that Pennsylvania common law determines the occurrence of "default" under the bond agreements must fail.

### B. Plaintiffs and Companies Did Not Materially Modify the Bonded Agreements Such that IFIC's Bonding Obligations are Discharged

In response to Plaintiffs' motion for summary judgment, IFIC asserts a defense that its liability for payment is discharged because the Plaintiffs and Companies made a material modification to the bonded obligation. In Pennsylvania, "courts have uniformly recognized that where the creditor and debtor materially modify the terms of their relationship without obtaining the surety's assent thereto, the surety's liability may be affected." *Continental Bank v. Axler*, 510 A.2d 726, 729 (Pa. Super. Ct. 1986), *appeal dismissed*, 540 A.2d 267 (Pa. 1988). A "material modification" is one that is a "significant change in the principal debtor's obligation to the creditor that in essence substitutes an agreement substantially different from the original agreement on which the surety accepted liability." *Id.* When such an event occurs, a surety's liability is discharged. *Id.* The standard for discharging a compensated surety is higher than that

13

for discharging an uncompensated one: "A compensated surety is discharged only if, without the surety's consent, there has been a material modification in the creditor-debtor relationship and said modification *has substantially increased* the surety's risk." *Id.* (emphasis added).  A compensated surety bears the burden of proof on the issue of discharge. *Amerisourcebergen Drug Corp. v. Meier*, No. 03-CV-6769, 2004 WL 2900702, at *7 (E.D.Pa. Dec. 14, 2004).

IFIC argues that the settlement agreements between Plaintiffs and Brown and B&G materially modified IFIC's liability such that discharge is proper.  The settlements required B&G and Brown to pay "settlement sums" of $654,469.08 and $163,945.39, respectively, over a period of 18 months in addition to their regular monthly contributions as required by the CBAs. The dual payments, IFIC contends, are significant enough changes to warrant discharge of its bond obligations.

The Court is not convinced that the settlement agreements effected a material modification of IFIC's bonding obligations such that discharge is proper.  Under the CBAs, which the parties agree were the bonded obligations, Brown and B&G were to pay fringe benefit contributions, interest, liquidated damages, fees and costs.  The settlement sums were for amounts then owed under the CBAs—the bonded obligation—and nothing more.  (B&G Settlement Agreement, Def.'s Mot. for Summ. J., Ex. 20, ¶ 1, Doc. 45-9; Brown Settlement Agreement, Def.'s Mot. for Summ. J., Ex. 21, ¶ 1, Doc. 45-9.)  The Plaintiffs even agreed to waive liquidated damages if Brown and B&G complied with the settlement agreements, which would have decreased IFIC's surety liability.  (B&G Settlement Agreement, ¶ 2; Brown Settlement Agreement, ¶ 2.)  Therefore, the settlement agreements did not substantially increase IFIC's liability and discharge is not warranted. *Cf. Reliance Ins. Co. v. Penn Paving, Inc.*, 734

14

A.2d 833, 839 (Pa. 1999) (holding that an unconsented increase in an indemnity obligation from $150,000 to $5 million was a material modification sufficient to discharge indemnitor's liability).

IFIC analogizes this case to *R.P. Richards, Inc. v. Chartered Construction Corporation* for persuasive value.  83 Cal. App. 4th 146 (Cal. Ct. App. 2000).  This Court examines *R.P. Richards, Inc.*, but notes that the case has no authoritative weight.  In *R.P. Richards*, a California appellate court held that a settlement agreement altered the original bonded obligation such that the surety was exonerated.  *Id.* at 155.  The facts, however, may be distinguished from the instant case.  In *R.P. Richards*, the settlement agreement imposed obligations on the principal, such as interest and attorney fees, that exceeded the original bonded obligation.  *Id.* at 151.  The settlement agreement also explicitly released all claims arising from the same subject matter other than those to enforce the settlement agreement.  *Id.*  The court concluded that the principal's release of the bonded obligation likewise released the surety from liability.  *Id.* at 155, 157-58.  Here, the Brown and B&G settlement agreements neither demand payment additional to the bonded obligations nor contain a release of such obligations.  In contrast to *R.P. Richards*, the Brown and B&G settlement agreements provide that Plaintiffs retain their right to recover all unpaid contributions from the delinquency periods that were the subject of litigation.  (B&G Settlement Agreement, ¶ 9; Brown Settlement Agreement, ¶ 9.)  For these reasons, the Court holds that the Brown and B&G settlement agreements did not materially modify IFIC's bonded obligations and IFIC's surety obligations are not discharged.

### C.  Plaintiffs are Entitled to Contributions, Interest, Liquidated Damages, Fees and Costs as Damages

Plaintiffs seek $1,029,729.98 in damages for IFIC's breach of the bond agreements. Pennsylvania law requires that a party seeking damages for breach of contract prove such damages with reasonable certainty.  *Exton Drive-In, Inc. v. Home Indem. Co.*, 261 A.2d 319, 324

(Pa. 1969).  To do so, a plaintiff "must show a causal connection between the breach and the loss."  *Divenuta v. Bilcare, Inc.*, Civ. A. No. 09-3657, 2011 WL 1196703, at *7 (E.D.Pa. Mar. 30, 2011) (quoting *Logan v. Mirror Printing Co. of Altoona, Pa.*, 600 A.2d 225, 226 (Pa. Super. Ct. 1991)).  "Damages may not be awarded on the basis of speculation or conjecture."  *Id.* (internal quotation marks omitted).  Whether damages are remote or speculative rests not on the difficulty of calculating the amount, but on the question of whether damages are identifiable.  *Id.* Further, "compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced . . . What the law does require . . . is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages."  *Mass. Bonding & Ins. Co. v. Johnston & Harder, Inc.*, 22 A.2d 709, 714 (Pa. 1941).

The causal connection between IFIC's breach and Plaintiffs' damages is clear in that IFIC's failure to pay under the bonds leaves Plaintiffs with no way to collect sums owed to them. Plaintiffs primarily rely on expert accounting reports to support their claim for the amount of damages.  Based on documents provided by Brown and Plaintiffs, an expert accountant determined that Brown owed $177,491.50 in delinquent contributions and other costs for the period between April 1, 2008 and June 30, 2010.[3]  (Brown Accounting Report, Pls.' Mot. for Summ. J., Ex. 20, 5, Doc. 44-25.)  Similarly, the accountant determined that B&G owed $963,890.67 for the same period.  (B&G Accounting Report, Pls.' Mot. for Summ. J., Ex. 21, 5, Doc. 44-31.)  Plaintiffs also demand interest accrued since the completion of the expert report and attorneys' fees incurred before June 2010.  In total, Plaintiffs seek $229,729.98 for the Brown Bond and $800,000, the full penal sum, for the B&G Bond.

---

[3] The documents provided to both the expert and the Court included the CBAs, contribution schedules, payroll records, cash disbursement records, and tax return statements.

IFIC argues that Plaintiffs do not establish their alleged damages with a requisite degree of reasonable certainty.  As support, IFIC points to filings where Plaintiffs have claimed varying amounts as damages at different stages of this litigation.  IFIC also argues that Plaintiffs do not include an itemization of the interest claimed or documentation substantiating the payment of attorneys' fees.

The Court finds that Plaintiffs' claim for damages is neither speculative nor conjecture. Plaintiffs made clear from the start of litigation that they sought all amounts due and owing under the Brown and B&G Bonds and Riders.  (Am. Cons. Compl., 4-5, Doc. 18.)  Stated quite plainly, the bond agreements require payment by IFIC of "current, delinquent, and future wages and/or fringe benefits and Union funds" and "the cost of collection including, but not limited to interest, liquidated damages, fees and costs, and all expenses related to the collection up to the total sum of" the bonds' penal amounts.  (B&G Bond, Pls.' Mot. for Summ. J., Ex. 9, ¶ 1, Doc. 44-14; Brown Bond, Pls.' Mot. for Summ. J., Ex. 10, ¶ 1, Doc. 44-15.)  Having entered into these agreements, IFIC knew that the extent of its liability would include all amounts due under the bonds and riders at the time of default.  This would include interest and attorneys' fees, which are "expenses related to the collection" of the bond payment.  *See Sloan & Co. v. Liberty Mutual Ins. Co.*, 653 F.3d 175, 186-87 (3d Cir. 2011) (interpreting "expenses and costs" incurred in enforcing a contract to include attorneys' fees as well as court and mediation costs); *Amerisourcebergen Drug Corp. v. Meier*, 2004 WL 2900702, at *11-12 (holding defendant liable for attorney's fees when the guaranty contract at issue provided for the payment of collection costs and expenses), *aff'd*, 251 F. App'x 786, 787 (3d Cir. 2007).  Further, the amount Plaintiffs claim "need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences."  *Molag, Inc. v.*

*Climax Molybdenum Co.*, 637 A.2d 322, 324 (Pa. Super. Ct. 1994) (quoting *Delahanty v. First*

*Pa. Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983)).  IFIC is aware of the calculation of

interest on delinquent contributions because the CBAs provide for it.[4]  An itemization of all costs

is therefore not required to succeed in a claim for damages.  IFIC also does not submit evidence

that disputes Plaintiffs' calculations.  *See Amerisourcebergen Drug Corp.*, 2004 WL 2900702, at

*11 (granting summary judgment for the plaintiff awarding $931,576.77 in damages in part

because the defendant failed to dispute the plaintiff's damages calculations).  Accordingly, the

Court concludes that damages in the amount of $1,029,729.98 are appropriate.[5]

### D.  IFIC Waived Its Defense of Fraudulent Non-Disclosure and the B&G Bond Rider is Valid

IFIC argues that the B&G Bond Rider is void because Plaintiffs failed to disclose

material information about B&G's delinquencies at the time of the B&G Bond Rider's issuance.

IFIC's liability under the B&G Bond would then be limited to only $400,000.  Pennsylvania law

on this issue is sparse.  In *Park Paving Co. v. Kraft*, the Pennsylvania Supreme Court opined:

> The true rule seems to be that, where the principal is in default, and the surety
> executed the bond in ignorance thereof, he will not be bound, where knowledge of
> such default was withheld from him by the obligee, but where the obligee is also
> ignorant of the default, or where the surety has knowledge of it, the bond is good.

---

[4] The CBAs state: "An Employer who has not paid its required contributions [by the due date] shall be required to pay, in addition to the unpaid contributions, interest equal to one percent (1%) of the gross amount of the contributions due the [Plaintiff] Fund for each month (or part of a month) the contributions remain unpaid." (E.g., Commercial Roofing CBA, Def. Mot. for Summ. J., Ex. 7, 46, Doc. 45-4.)

[5] IFIC also argues that Plaintiffs are not entitled to damages because they failed to take reasonable action to mitigate damages and they inexcusably delayed notification of default.  It lists reasonable mitigating actions including notifying IFIC of default in August 2008, making demands on the bonds within 90 days of a delinquency as provided in Plaintiffs' collection policy, withdrawing union laborers from Brown and B&G's employ, and delaying notice to IFIC for six months after Brown and B&G breached the settlement agreements.  An injured plaintiff's duty to mitigate damages arises at the time of the defendant's breach. *Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996); *Bafile v. Borough of Muncy*, 588 A.2d 462, 464 (Pa. 1991).  The Court has already determined that breach of the bond agreements occurred at or after June 2010.  This renders IFIC's proposed mitigating actions largely irrelevant as they would have had to take place before the breach.  Regarding IFIC's equitable argument that Plaintiffs inexcusably delayed notification of default, the Court has already addressed this issue and will not revisit the matter for the purposes of assessing damages.

> Where the principal was a defaulter and indebted to the plaintiff, and that fact was withheld from the sureties when the bond was given, such concealment was a fraud upon the sureties and avoided the bond as to them.

105 A. 39, 40 (Pa. 1918) (internal citations omitted).  In that case, the principal was required by contract to furnish a bond, but proceeded with his construction work without one.  *Id.*  Only after the principal defaulted and became liable for damages did he secure a bond.  *Id.*  The Court held that because the surety was not made aware of the existing indebtedness, the surety was not liable for those damages.  *Id.*; *c.f. Borough of Punxsutawney v. Mitchell*, 182 A. 370, 374 (Pa. 1936) (declining to discharge the surety's liability because the obligee did not know of the principal's default at the time of the bond's creation, even though the obligee's failure to know was negligent). The Restatement (First) of Security provides some helpful guidance:

> Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

§ 124 (1941).  The rule does not require the obligee to investigate for the surety's benefit, but if the surety requests material information, the obligee must disclose it.  *Id.* cmt. b.  The rule also applies to successive extensions of credit.  *Id.* cmt. c.

The non-disclosure of material facts is an act of fraud against the surety.  *Id.* cmt. a.  Such an allegation of fraud must be raised as an affirmative defense under Pennsylvania law.  PA. R. CIV. P. 1030(a).  "Matters treated as affirmative defenses under state law are generally treated in the same way by federal courts in diversity cases."  *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991).  To assert an affirmative defense in federal court, a party must do so in a pleading or appropriate motion or else the matter is waived.  *Id.*; FED. R. CIV. P. 8(c)(1).  Waiver, however, is not automatic if the district court determines that the "[defendant] raised the issue at a

pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond." *Charpentier*, 937 F.2d at 864 (internal quotation marks omitted); *Eddy v. Virgin Islands Water and Power Auth.*, 256 F.3d 204, 210 (3d Cir. 2001).

Because Pennsylvania law treats a defense of fraud as an affirmative defense, this Court also treats it as an affirmative defense and requires that it be raised in a pleading or appropriate motion.  Because IFIC failed to do so, the Court finds that IFIC waived its defense of fraudulent non-disclosure of material fact to invalidate the B&G Rider.  The first time that IFIC raises the defense is in response to Plaintiffs' present motion for summary judgment.  The defense of fraud does not appear in either of IFIC's Answers to the Complaint or Amended Consolidated Complaint.  Waiting until after the close of discovery to raise a defense of fraud and doing so only in response to Plaintiffs' summary judgment motion is not a sufficient exercise of diligence by IFIC in asserting the defense.  The Court also finds that Plaintiffs suffered prejudice as a result of the delay because they were foreclosed from conducting discovery on the issue.

Even if the defense had not been waived, IFIC fails to proffer evidence sufficient to support a finding of fraudulent non-disclosure by Plaintiffs.  True, IFIC demonstrates that B&G had an outstanding delinquency of approximately $365,000 at the time IFIC issued the B&G Bond Rider.  IFIC also shows that Plaintiffs knew of this delinquency.  (Def.'s Mot. for Summ. J., Ex. 16, Doc. 45-7.)  IFIC, however, cannot establish that Plaintiffs concealed this information from IFIC.  At no time did IFIC request information about B&G's financial condition from Plaintiffs.  Plaintiffs also had no reason to know that IFIC was issuing the B&G Bond Rider in reliance on a mistaken belief.  Rather, the evidence shows that IFIC had concerns as early as 2007 about B&G's financial condition.[6]  For these reasons, IFIC's defense of fraudulent non-

---

[6] Deposition testimony of Laura Penhale, IFIC underwriting manager, establishes that IFIC was aware of potential issues with B&G's financial condition:

disclosure by Plaintiffs fails and the B&G Bond Rider is valid.  IFIC is therefore liable for the

full penal amount of $800,000 on the B&G Bond.

### E.  A Genuine Issue of Material Fact Exists as to Whether Plaintiffs are Entitled to an Additional Award of Attorneys' Fees

Finally, Plaintiffs appeal to this Court's equitable power for an additional award of

reasonable attorneys' fees and costs.  More specifically, Plaintiffs seek attorneys' fees beyond

the amount contracted for in the bond agreements.  The award of attorneys' fees in federal court

litigation is governed by the so-called 'American Rule' in that "attorneys' fees are not ordinarily

recoverable in the absence of a statute or enforceable contract providing therefor."  *F.D. Rich*

*Co., Inc. v. U.S. for Use of Indus. Lumber Co., Inc.*, 417 U.S. 116, 126 (1974) (internal quotation

marks omitted); *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)

("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable

attorneys' fee from the loser.").  Pennsylvania law similarly abides by the 'American Rule.'

*Sloan & Co. v. Liberty Mutual Ins. Co.*, 653 F.3d 175, 186 (3d Cir. 2011); *McMullen v. Kutz*, 985

A.2d 769, 775 (Pa. 2009).  Absent an applicable contractual provision, Pennsylvania law does

not allow awards of attorneys' fees in ordinary breach of contract actions.  *Sypeck v. State Farm*

*Mut. Auto. Ins. Co.*, No. 3:12-CV-324, 2012 WL 2239730, at *4 (M.D.Pa. June 15, 2012) (citing

*McMullen v. Kutz*, 985 A.2d at 775).  An exception applies, however, "when [a prevailing

party's] opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]"

---

Q: . . . Do you recall whether in 2007 there were any specific major issues relating to this [Brown and B&G] account?
A: Bank debt was always a big issue.
Q: In what respect?
A: They were heavy bank loaners and there was always concern of whether they had sufficient cash flow.
Q: . . . When you say that there was a concern, I gather it was a concern of your company?
A: It was an underwriting concern, yes.

(Penhale Dep. 42:13-23, Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J., Ex. 32, Doc. 46-12.)

*F.D. Rich Co., Inc.*, 417 U.S. at 129; *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765-66

(1980).  To prevail in a request for attorneys' fees under the bad faith exception, a party "bears a

heavy burden in establishing bad faith and the Court must exercise this power sparingly."  *Singer*

*v. Uni-Marts, Inc.*, Civ. A. No. 84-668, 1985 WL 351, at *5 (W.D.Pa. Apr. 30, 1985) (citing

*Roadway Express, Inc.*, 447 U.S. at 767).  "An award should be made only in extraordinary

circumstances and requires more than a showing of a weak or legally inadequate case."  *E.E.O.C.*

*v. BE & K Engineering Co.*, 562 F. Supp. 2d 641, 645 (D. Del. 2008) (discussing the required

showing of bad faith to warrant an award of attorneys' fees from litigating an action under the

Age Discrimination in Employment Act).

     In support of their motion, Plaintiffs argue that IFIC exhibited bad faith when it

"continue[d] to refuse to pay the bonds claims."  (Memo. of Law in Supp. of Pls.' Mot. for

Summ. J., 14, Doc. 44-3.)  However, they do not show how IFIC's counsel acted in willful bad

faith or exhibited any "serious and studied disregard for the orderly process of justice."[7]  *See*

*Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir. 1986) (discussing conduct undertaken in bad

faith that would warrant an award of attorneys' fees under 28 U.S.C. § 1927).  There remains a

genuine issue of material fact over whether continued refusal to pay the bonds constitutes "bad

faith" for the purposes of awarding attorneys' fees.  Accordingly, the Court denies Plaintiffs'

motion for summary judgment on this limited issue.

## IV.    CONCLUSION

     For the reasons set forth above, the Court grants in part and denies in part Plaintiffs'

Motion for Summary Judgment.  The Court also denies Defendant's Motion for Summary

Judgment in its entirety.  An appropriate order follows.

---

[7] Rather, the evidence appears to show that IFIC acted reasonably in this litigation as it prevailed against
two of Plaintiffs' motions to compel during the discovery period.  (Docs. 42, 43.)